UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9|13|10
```

------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,

              Plaintiff,

  -against-

CREDIT BANCORP, LTD., CREDIT
BANCORP, INC., RICHARD JONATHAN
BLECH, THOMAS MICHAEL RITTWEGER,
and DOUGLAS C. BRANDON,

             Defendants.

------------------------------------X

99 Civ. 11395

OPINION

A P P E A R A N C E S:

      Attorneys for Plaintiff

      SECURITIES AND EXCHANGE COMMISSION
      15 West South Temple, Suite 1800
      Salt Lake City, UT  84101
      By:  Thomas M. Melton, Esq.

      SECURITIES AND EXCHANGE COMMISSION
      233 Broadway
      New York, NY  10279
      By:  Robert Blackburn, Esq.

      Pro Se

      THOMAS RITTWEGER
      Reg #:  51309-054
      FCI Fort Dix Camp
      P.O. Box 2000
      Fort Dix, NJ  08640

Sweet, D.J.


Defendant Thomas Rittweger, pro se, ("Rittweger" or
the "Defendant") has moved for declaratory judgment to bar the
plaintiff Securities and Exchange Commission ("SEC" or the
"Plaintiffs") from prosecuting this action against him, in view
of the criminal prosecution against him resulting in his
incarceration and the imposition of an order of restitution in
the amount of $18,128,599.40.  Upon the conclusions set forth
below, the motion of Rittweger is denied.


The SEC has moved under Rule 56, Fed. R. Civ. P. for
summary judgment against defendant Thomas Michael Rittweger
("Rittweger" or the "Defendant") for violation of Section
17(a)(1), (2) and (3) of the Securities Act of 1933 ("Section
17(a)") (15 USC § 77q(a)(1), (2)); the Defendant violated
Section 10(b) of the Securities and Exchange Act of 1934
("Section 10(b)") (15 USC § 78(b)) and Rule 10b-5 thereunder
("Rule 10b-5") (17 C.F.R. § 240.10b-5); a permanent injunction
against future violations of these statutes; disgorgement; and a
civil monetary penalty.  Upon the findings and conclusions set
forth below, the motion of the SEC is granted.


1

## I.  **Prior Proceedings**

The SEC filed this action on November 17, 1999, a Temporary Restraining Order, Asset Freeze and Order to Show Cause on November 17, 1999.  SEC v. Credit Bancorp, Ltd., et al., 99 Civ. 11395, Docket No. 3.

On January 24, 2000, an Order was entered appointing Carl H. Loewenson, Jr., as Receiver (the "Receiver") for Credit Bancorp and all its subsidiaries and affiliated entities. Credit Bancorp, 99 Civ. 11395, Docket No. 87.  Pursuant to the Order, the Receiver was granted control of Credit Bancorp's assets, files, and records.  Id.

On September 7, 2001, this Court awarded Summary Judgment against defendant Richard Blech ("Blech").  Credit Bancorp, 99 Civ. 11395, Docket No. 753.

On January 31, 2002, Rittweger was indicted in the Southern District of New York on counts of Conspiracy to Defraud the United States, Securities Fraud, Wire Fraud, and Racketeering.  USA v. Blech, et al., 02 Cr. 122, Docket No. 8.

2

On March 28, 2002, this Court awarded Summary Judgment against Douglas Brandon ("Brandon"). Credit Bancorp, 99 Civ. 11395, Docket No. 832.

On June 26, 2003, in the parallel criminal case, Rittweger was found guilty of four counts of Conspiracy to Defraud the United States, two counts of Securities Fraud, two counts of Wire Fraud, and two counts of Racketeering. Blech, 02 Cr. 122, Docket No. 110. On June 28, 2005, in the parallel criminal case, Rittweger received a sentence of 135 months and was ordered to pay restitution of $18,128,599.40 and a special assessment of $1,300.00. Blech, 02 Cr. 122, Docket No. 192. On August 4, 2005, in the parallel criminal case, the Court issued an order requiring Rittweger to surrender to the Bureau of Prisons on October 28, 2005. Blech, 02 Cr. 122, Docket No. 224. Rittweger surrendered for imprisonment on January 27, 2006 to serve his time at the Federal Correctional Institution in Fort Dix, New Jersey. Blech, 02 Cr. 122, Docket No. 239.

Through his prison sentence, Rittweger continues to appeal to the court, including a petition for writ of habeas corpus, denied by the Honorable Noel L. Hillman of the U.S. District Court of New Jersey on July 29, 2009 for lack of

3

jurisdiction.  See Rittweger v. United States, 09 Civ. 3514 (D.
N.J.) at Docket #2.

In response to his denial, Rittweger submitted a
letter to Judge Hillman on August 17, 2009 requesting to either
stay the matter for further consideration or appeal the decision
of the court.  Letter from Thomas Rittweger, Defendant to The
Honorable Noel L. Hillman, U.S. District Judge (Aug. 12, 2009 ).
Id. at Docket #4.

On September 2, 2009, Judge Hillman issued an order to
reopen Rittweger's petition for a writ of habeas corpus.  Order
Reopening Case.  Id. at Docket #5.  To date, no decision has
been made.

On October 28, 2009, the SEC submitted the present
motion for summary judgment.  On February 22, 2010, Rittweger
submitted the present motion for declaratory judgment. Both
motions were considered fully submitted on June 5, 2010.

II.  **The Facts**

4

The facts are set forth in the SEC Statement of
Undisputed Facts and are challenged by letters of Rittweger
dated June 3 and 21, 2010.

Rittweger, age 50, is a resident of New Jersey.  He is
currently held as an inmate in the Federal Correctional
Institution in Fort Dix, New Jersey, beginning on January 27,
2006 and sentenced to 135 months.  USA v. Blech, et al., 02 Cr.
122, Docket No. 239.  Rittweger formerly held the title of
Managing Director for North America of Credit Bancorp, Ltd.

Beginning in 1997 Credit Bancorp began contacting
individuals, such as chairmen and chief executive officers of
public companies, to solicit their investment in Credit
Bancorp's "Insured Credit Facility Program."  Solicitation for
this program was done through Credit Bancorp employees as well
as representatives that were not employed directly by Credit
Bancorp.  The insured credit facility program was represented to
investors as providing an investment opportunity to high net
worth individuals with a minimum investment of $250,000.

Investors could borrow money at financing rates
substantially lower than competing brokerage houses using a

5

variety of assets as collateral.  Additionally, investors were given the opportunity to earn a "dividend" based on the value of their unencumbered collateral.  This dividend was in addition to the normal dividends or interest earned on the collateral asset. The amount of the promised "dividend" generally ranged from four to six percent.

Participation in Credit Bancorp's credit facility program began by submitting the proposed collateral for approval to a Credit Bancorp representative.  Once the collateral was approved, Credit Bancorp instructed the investor to execute and send to a designated Credit Bancorp office two documents:  the "CBL Insured Credit Facility Agreement," which was the contractual agreement laying out the terms of the credit facility program, and a separate "Letter of Engagement," which engaged the trustee.  The investors would then transfer their securities or other assets to Credit Bancorp to be placed in a Credit Bancorp account pursuant to specific directions in the Letter of Engagement.  Often, securities were transferred directly to Rittweger pursuant to the instructions in the Letter of Engagement.

6

Credit Bancorp would direct investors to remove the restrictive legends on their securities.  Credit Bancorp told investors that the U.S. dollar assets placed in trust would be transferred electronically to a Credit Bancorp custodial account in a U.S. money center bank, which was rated AA or better by Moody's Investor Services.

Credit Bancorp told investors that Lloyd's of London would insure all assets pledged by investors for $500 million per loss.

The "CBL Insured Credit Facility Agreement" stated that "[n]either CBL nor the Trustee will at any time sell, pledge, assign, margin, lien, hypothecate, encumber, or otherwise dispose" of an investor's assets.  The Engagement Letter from Brandon stated:  "[o]nly I as trustee will have signatory or withdrawal power over the account under the terms of the Credit Facility . . .."  Rittweger also represented to investors that securities and assets deposited with Credit Bancorp would not be transferred, disposed of, or otherwise encumbered.

7

In reality, investors' assets were routinely margined, pledged, hypothecated, and sold short without investors' knowledge.  The proceeds from the misuse of investor assets were used to fund a variety of different trading strategies, business expenses, personal expenses, and various business investments. Credit Bancorp's business investments were largely unprofitable and included an investment of over $1,000,000 in a hotel in the south of France, a $3,000,000 investment in the University of Southern Europe, and the purchase of a $600,000 yacht.

Credit Bancorp claimed to make money by engaging in a propriety investment strategy that took advantage of Credit Bancorp's unique relationships with European banking/institutional counterparts.  Credit Bancorp claimed to use customer assets that were held in the credit facility program as collateral for intra-day trading strategies that had zero losses.  This Court has found "the uncontested facts prove that [investors'] assets were not held in custodial accounts and investor securities were sold or margined."  SEC v. Credit Bancorp, Ltd., 195 F.Supp.2d 475, 492 (S.D.N.Y. 2002).

Rittweger's official titles at Credit Bancorp were Managing Director, North America of Credit Bancorp, Ltd. and

President of Credit Bancorp & Co.  Rittweger was held out to investors as a licensed securities broker.  Rittweger acted as the contact person between investors and Credit Bancorp in order to facilitate participating in the credit facility program.

Rittweger started his career with Credit Bancorp while he was working at Summit Financial Resources ("Summit"), primarily marketing Credit Bancorp's credit facility to the Summit clients that he managed.  In late 1997, Rittweger became a salaried employee of Credit Bancorp as the Managing Director, North America at Credit Bancorp, Ltd.

Rittweger had a team of independent agents that hawked the credit facility program to investors and referred potential investors to Rittweger's office in Tom's River, New Jersey.  By 1999, there were approximately 30 brokers reporting to Rittweger and approximately 75 contacts under his direction.  Rittweger was responsible for and held sole discretion in compensating these independent agents.

While Blech in Geneva, Switzerland was responsible for the overall management of the company, Rittweger dealt with the day-to-day sales operations of Credit Bancorp, reporting to

9

Blech at least a few times per week.  Blech met with Rittweger personally on at least 9 separate occasions.

Rittweger was known within Credit Bancorp as being extraordinarily successful in marketing the credit facility.

Rittweger personally assured investors that their securities would not be transferred, disposed of, or otherwise encumbered.  Additionally, Rittweger personally sent out the Credit Facility Agreement and the Letter of Engagement to investors.

Rittweger, in his capacity at Summit as well as at Credit Bancorp, frequently instructed investors to send their stock certificates, used as collateral in the credit facility, directly to his custody.

When stock certificates were sent to the "trustee," Brandon would forward them directly to Rittweger.  Rittweger, then, would either send the physical securities to a depository institution by courier or, more frequently, personally deliver the securities to the depository institution.

10

In addition to a yearly salary, Rittweger was paid a
3% commission per year on each credit facility transaction he
brought in based on the asset value of the transaction.   In 1998
and 1999, Rittweger received $200,000 in salary and over
$2,765,000 in commissions.

Rittweger controlled a "Credit Bancorp" check account
at Commerce Bank, which was used to receive his commission
payments, compensate brokers, distribute dividends to customers,
and fund expenditures needed to maintain the Tom's River office.
In contravention of two orders to provide records of this
account, Rittweger has failed to provide any documentation of
his accounts.

Upon Commerce Bank providing the necessary
information, the account summary for the CBL checking account
showed $10,691,760 deposited through the period of Rittweger's
financial scheme.   Of that amount, distribution of dividends to
customers amounted to $1,675,166.   Numerous transfers were also
conducted to a second CBL-controlled account held at Bank of
America in San Diego, California, amounting to $689,254.   After
these deductions, Rittweger had sole discretion at the use of
the remaining $8.4 million.   The CBL Commerce Bank account

11

statements indicated personal use of the account by Rittweger, including numerous ATM transactions, as well as purchases at Victoria's Secret, Home Depot, Toys R Us, Radio Shack, various jewelry stores, and Barnes & Noble.

On November 12, 1999, Rittweger transferred $500,000 from the CBL Commerce Bank account into a separate checking account filed under the names of Rittweger and his wife (also held at Commerce Bank).  Although the November 1, 1999 Court Order froze all CBL assets and personal assets of Rittweger, he then transferred the $500,000 into a third account held under only his wife.

On November 29, 1999, Rittweger transferred an additional $100,000 from the CBL checking account into a newly opened account at Summit Bank under his wife's name.

Rittweger maintained a second account at Salomon Smith Barney in Tom's River, NJ.  This account was also opened under the name of Credit Bancorp and was used by Rittweger for the explicit purpose of receiving commissions.  Through three transactions, Rittweger transferred a total of $200,000 from the CBL Commerce Bank account into the Salomon Smith Barney account.

12

Rittweger then transferred the $200,000, plus an additional $41,000 from securities transactions, from this account to a series of accounts held by Rittweger's wife.

As a companion account to the CBL Commerce Bank account, Rittweger also maintained a brokerage account at Commerce Capital Markets. Rittweger transferred 400,941 shares of FiNet Holdings to an unknown destination. These shares were valued at approximately $886,000.

Although Rittweger not only maintained the CBL Commerce Bank account for commissions and expenses but also controlled the CBL Salomon Smith Barney account solely to handle commission payments, he also claims to have received commission payments through a third account. During the time of the financial scheme at CBL, Rittweger received at least three commission payments in an account at Coutts Bank in Switzerland held by "Tower Financial, Ltd.," an entity registered under the name of Rittweger's wife. Rittweger's counsel stated that Rittweger had transferred $800,000 from a Tower Financial Account in Switzerland to pay his long-overdue taxes and purchase a piece of recreational property. Rittweger claims the deposits to this account have come from various sources, but has

13

provided no documentation to support his claim.  The court order
receiver approximates $650,000 to be attributable to CBL.  While
Rittweger has not provided documentation to trace the exact
amounts of the deposits, in January 2000, he transferred
$926,063 to another account held under his wife's name.

The value of the assets transferred in violation of
the Court Order freezing assets totals $2,653,063.

Rittweger made representations as described in the
following findings.  The Credit Bancorp Engagement letter from
Brandon, one of two documents needed for the execution of a
credit facility agreement, stated:  "[o]nly I as trustee will
have signatory or withdrawal power over the account under the
terms of the Credit Facility . . .."  Of the 37 bank accounts
that Credit Bancorp maintained, Brandon was the sole signatory
on only one minor account.  Credit Bancorp, 195 F.Supp.2d at
482.  It became routine practice that when Brandon received
instructions from a client regarding assets, the instructions
would be forwarded on to Blech's office in Geneva with a copy
also going to Rittweger's New Jersey office.

14

Rittweger explained to Glenn Hobin ("Hobin") that the role of the trustee was to protect the safety of the investors' assets.   Further, Rittweger explained to Hobin that in the event of a threat to the investors' assets, the trustee would act to aggressively protect the assets on behalf of the client. Rittweger also explained that the trustee would be able to return the assets to the client.

Rittweger opened a brokerage account with Pershing Investments, located in New Jersey, for Credit Bancorp.   Blech acknowledged that Brandon was not a signatory on this, or to his knowledge, any other Credit Bancorp account.

In one particular transaction, the physical securities involved in the transaction were sent to Rittweger who forwarded them to Blech in Geneva.   Blech intended to deposit the shares into a trading account with Deutsche Bank.   However, when Blech attempted to deposit the shares in Deutsche Bank, he was told that the bank would not be interested in extending a credit line against the stock.   At this point, Blech contacted Rittweger and said he would have to deposit the shares in another account where there was no trustee and where they would only be under

15

Blech's signature. In response, Rittweger told Blech to "[g]o do it we've got to get it done."

Rittweger represented to investors that securities and assets deposited with Credit Bancorp would not be transferred, disposed of, or otherwise encumbered.

Hobin stated that Rittweger provided him an explanation to help him understand the credit facility program. Further, based on representations made by Rittweger and others, Hobin understood that assets deposited into the credit facility program would be protected by a trustee and would not be placed at risk.

Rittweger stated to others at Credit Bancorp that he did not want investors to see account statements that indicated investors' securities were deposited in margin accounts.

Efforts to cover up the margining of investor assets included altering documents. Upon approval from Rittweger, account statements were scanned into a computer then altered to hide the fact that investor securities were placed in margin

16

accounts.  These altered statements were sent to Rittweger, who apparently passed them on to investors.

In February of 1999, Rittweger was involved in a meeting with Tasin & Company, a broker-dealer with whom Credit Bancorp had a large trading account.  Credit Bancorp's trading account with Tasin & Company largely contained investors' assets of the credit facility brought in by Rittweger.

At the February meeting with Tasin & Company, Rittweger had a list of securities that Credit Bancorp wished to deposit in the Tasin & Company account and wanted to know what the margin value would be on those securities.  Those securities would have been margined in the Tasin & Company account.  Also discussed was the treatment that Credit Bancorp had received from Tasin & Company regarding previous margin calls on Credit Bancorp accounts.

Credit Bancorp used investor assets to establish option strategies.  The option strategy basically put investors' securities as collateral to back transactions which consisted of the sale of investors' securities.  The assets used for option strategies were mainly from clients of Rittweger.

17

Credit Lyonnais was Credit Bancorp's primary institution for providing option strategies.  However, investors were not told about this arrangement with Credit Lyonnais.  Blech discussed with Rittweger the use of the option trading strategy with Credit Lyonnais for stocks that were not marginable.

In one particular transaction, Rittweger was informed by Blech that the investor's stock was put into jeopardy by a margin call on a JP Morgan account where the shares were deposited.  Rittweger and Blech contemplated ways to stall JP Morgan while they looked for ways to get other funds or securities into the account to cover the margin call.  Eventually, shares of the investor's stock were liquidated by JP Morgan to cover the margin call.  Rittweger discussed buying back shares, replacing those that had been liquidated, to return to the investor.

Rittweger was present for discussions in Credit Bancorp's Geneva trading room in which the trading of investors' assets was discussed.  Specifically, the trading of

18

Environmental Technologies, Inc. stock, Vitech stock, and Praegitzer Industries stock were discussed.

Credit Bancorp claimed it would receive a determined market value for the securities held in its insured accounts. That value was used to engage in intra-day propriety trading strategies.

Rittweger explained part of the propriety investment strategy to Hobin by using the example of currency arbitrage which, according to Rittweger, took advantage of "the difference between buying and selling" resulting in profit. Rittweger further explained that riskless arbitrage allowed for profits to be locked in through certain transactions.

Blech overheard Rittweger speaking to representatives of a large potential investor about Credit Bancorp's propriety investment strategy. Rittweger stated that Credit Bancorp took advantage of its European banking arrangements and engaged in riskless arbitrage. According to Blech, this "had nothing to do with anything remotely close to what CBL's trained activities were."

19

Credit Bancorp retained the public relations firm
Ruder Finn to help develop the image of the company and work on
Credit Bancorp's marketing strategy.  Part of this marketing
strategy was the development of a marketing brochure for Credit
Bancorp.

The Ruder Finn brochure stated that Credit Bancorp's
"current book business" was $2 billion and expected to triple.
Rittweger provided this information to Ruder Finn.

Rittweger told Hobin that he had closed a large deal
with Mitsui Trust Bank ("Mitsui") and that Mitsui could now be
used as a reference for potential investors.

Rittweger explained to Hobin the terms of using Mitsui
as a reference.  The Mitsui reference would be compensated a
percentage of every transaction brought in using the Mitsui
reference.

Rittweger stated as part of his sales pitch that
Credit Bancorp had closed a $50 million deal with Mitsui.
Mitsui never invested with Credit Bancorp.

20

Rittweger informed Blech that investors were concerned that Credit Bancorp was a foreign company and had foreign relationships. As such, Credit Bancorp represented to investors that assets would be held in U.S. banks or brokerage firms that carried a rating of AA or better.

Rittweger represented to Hobin that investor securities would be held in U.S. money centers. Credit Bancorp had numerous foreign bank accounts in which investor assets were deposited.

Steven Joffe ("Joffe") is the Chief Executive Officer and largest shareholder of LCA Vision, Inc. ("LCA"). The common stock of LCA is traded on the NASDAQ stock exchange under the symbol of LCAV.

In or around the summer of 1997, Joffe was contacted regarding Credit Bancorp's credit facility. The credit facility had been represented to Joffe as an opportunity to borrow money while using share certificates as collateral for the loan. In addition, Rittweger represented to Joffe that the value of the unencumbered shares would generate a dividend.

21

Rittweger discussed the transaction with Blech.  Blech was concerned that the stock was not marginable, but discussed the possibility of using the stock in some sort of options trading strategy.

Rittweger, in his capacity as a registered representative of Summit, contacted Joffe and represented that he was "the contact between [Joffe] and Credit Bancorp in getting the [credit facility] deal accomplished."  Soon thereafter, Rittweger, in his capacity with Credit Bancorp, sent Joffe the Credit Facility Agreement and Letter of Engagement.

In September of 1997, Joffe agreed to invest approximately 2,850,000 shares of LCAV stock in the credit facility program in the form of 3 stock certificates of 950,000 shares apiece.  Joffe delivered the physical stock certificates to Rittweger.  One stock certificate was deposited in Bankers Trust, a bank located in Monaco.  An option-type transaction was started using the LCAV shares as collateral.

Shortly after delivering the shares, Joffe decided to terminate his relationship with Credit Bancorp.  In early October of 1997, Joffe contacted Rittweger and demanded the

22

return of his shares.  Joffe met with Rittweger in person at a
hotel in New York and stated that he wanted his shares back and
that he wanted to terminate his relationship with Credit
Bancorp.  Rittweger replied that it would not be a problem to
return the shares.

Subsequently, on or about November 3, 1997, Credit
Bancorp returned only two of the three stock certificates Joffe
had previously delivered to Credit Bancorp.  Credit Bancorp did
not return Joffe's third stock certificate, representing
approximately 950,000 shares of LCAV stock.  On November 3,
1997, Joffe faxed a written request to Rittweger demanding the
return of the remaining 950,000 shares and threatening legal
action against Credit Bancorp in the event of noncompliance.  In
response to Joffe's request, Credit Bancorp informed Joffe that
his remaining shares had been misplaced and could not be
returned at that time.

On December 29, 1997, Joffe received a letter from
Credit Bancorp stating that his remaining shares had been
located and were being held in a trust account at the Bank of
New York.

23

On January 12, 1998, 490,000 shares of Joffe's LCAV stock were sold by JP Morgan to pay back an account deficit on Credit Bancorp's account.

Blech provided Rittweger and others with the account statements from JP Morgan indicating the sale of Joffe's LCAV stock.  Blech discussed with Rittweger and others how they would buy back the shares that had been sold by JP Morgan.  Rittweger suggested that Credit Bancorp send Joffe documentation indicating they were about to transfer 950,000 shares of LCAV to Joffe, yet at that time Credit Bancorp did not have these shares to transfer.

On April 1, 1998, Joffe received an unsolicited wire transfer from Credit Bancorp in the amount of $1,662,500. According to Credit Bancorp, this amount represented the value of Joffe's unreturned shares and was intended as compensation in lieu of an actual return of the shares.  The monies used to pay Joffe came from Credit Bancorp funds, including the funds of other investors.

The stock price of LCAV had approximately halved from the time Joffe had requested the return of the shares to the

24

time Credit Bancorp had sent the payment of $1,662,500.  Joffe

accepted the $1,662,500 payment as a loan and sent a contract to

Credit Bancorp indicating such.  Joffe had not received his

shares back as of the commencement of this action.

In 1997, William St. Laurent ("St. Laurent") was the

president and chief operating officer of Vitech America, Inc.

("Vitech"), a company based in Brazil with an office in Miami,

Florida.  At that time, Vitech was publicly traded on the NASDAQ

stock exchange under the symbol VTCH.  St. Laurent is also a

general partner of Wolf Partners, LP ("Wolf"), which owned

approximately 2.4 million shares of Vitech stock.

In the second half of 1997, Rittweger contacted St.

Laurent about investing in Credit Bancorp's credit facility

program.  Rittweger outlined a program that would pay a six

percent dividend on deposited securities.

St. Laurent suggested changing the language in the

credit facility agreement to read, "[i]nsured Trustee will not

at any time sell, trade, pledge, hypothecate, transfer or

otherwise dispose of the Securities . . ."  Rittweger assured

25

St. Laurent that Credit Bancorp would abide by those
restrictions.

Rittweger asked Blech if it would be a problem to
include the modified language suggested by St. Laurent in the
final credit facility agreement.  Blech responded that it did
not explicitly say margin so there would be some "wiggle room."
Rittweger concurred.

St. Laurent originally declined Rittweger's credit
facility proposal, but Rittweger persisted.  Finally, in the
beginning of 1998, St. Laurent invested 1,650,000 shares of
Vitech stock, worth approximately $22 million, with Credit
Bancorp.  Rittweger had agreed to St. Laurent's suggested
changes in the final credit facility agreement.

Rittweger instructed St. Laurent to split up the
Vitech stock into four blocks of 412,500 shares each and deposit
a block of shares into each of four different accounts.  This
request was based on a discussion between Rittweger and Blech
deciding that splitting up the shares into four blocks would
optimize the margin value of the stock.  Rittweger further

26

instructed St. Laurent to remove the restrictive legend on the shares prior to transferring them to Credit Bancorp.

St. Laurent's Vitech stock was margined in Credit Bancorp accounts located outside of the United States.   An options trading strategy was established through Credit Lyonnais using St. Laurent's Vitech stock as collateral.

In July of 1998, St. Laurent noticed large volumes of Vitech stock in the market and contacted Rittweger expressing his concern that the shares may have "leaked" into the market and demanding the return of his securities.

In response to St. Laurent's request for the return of his shares, Rittweger assured St. Laurent that the shares were absolutely under Credit Bancorp's control and that he would start work on returning the shares.

On August 12, 1998, St. Laurent sent a letter to Rittweger and Brandon requesting the return of his shares, with the exception of 300,000 shares, to remain as collateral for a loan previously drawn against the shares.

27

St. Laurent spoke to Rittweger many times about getting his shares back.  Rittweger was St. Laurent's "day-to-day" contact at Credit Bancorp.

St. Laurent's shares could not be returned because Credit Bancorp was short some shares and others were encumbered at the time of his request.

On August 13, 1998, Brandon sent a letter to St. Laurent stating Credit Bancorp was in the process of calculating the balance due on St. Laurent's account.  Rittweger and Blech discussed this letter as being a delay tactic while they tried to unencumber or buy back St. Laurent's shares.  St. Laurent recognized this as a delay tactic.

Some of St. Laurent's Vitech shares were placed in Credit Bancorp accounts where Rittweger was the sole signatory on the account.  Some of St. Laurent's shares were finally returned to St. Laurent from various sources over a long period of time.  Rittweger and Blech were primarily responsible for orchestrating the return of the shares.  The trustee, Brandon, had little to no role in the actual return of the shares.

Charles Corey Stephenson, Jr. ("Stephenson") is chairman of the board for Vintage Petroleum Industries ("Vintage"), a company headquartered in Tulsa, Oklahoma. Vintage is a publicly traded company on the New York Stock Exchange under the symbol VPI.

In March of 1999, Stephenson was contacted by a representative from Sterling Capital about an investment opportunity with Credit Bancorp. Stephenson was told that Mitsui had made a $300 million dollar investment with Credit Bancorp.

In the summer of 1999, Stephenson entered into a credit facility agreement with Credit Bancorp and transferred approximately 8 million shares of Vintage to Credit Bancorp worth between $90 and $100 million. Rittweger received approximately $1.5 million in commissions on the Vintage transaction. Rittweger had part of his commissions wired to a personal offshore bank account, apparently for tax purposes.

Stephenson received a call from a newspaper reporter asking him if he was aware that some of his shares were tied up in a problem with Credit Bancorp. After receiving this call,

Stephenson called Rittweger to request information.  Stephenson
was provided with redacted account statements from Credit
Bancorp showing his shares in a variety of different accounts.

Blech discussed with Rittweger and others the transfer
of Stephenson's shares from a Coutts Bank account to another
Credit Bancorp account at Legg Mason.  According to Blech, the
reasoning for this transfer was because Coutts Bank was not
interested in providing a good line of credit against
Stephenson's stock while Legg Mason afforded more favorable
trading investments and margin opportunities.

Stephenson requested the return of his Vintage stock
from Credit Bancorp.  His stock had not been returned to him as
of the commencement of this action.

Rittweger did not submit an opposing statement
challenging the facts set forth above.

No denial of the 67 numbered paragraphs was submitted.
Rittweger, by letter of June 3, 1010, challenged facts based on
Blech's testimony and cited statements by Blech which Rittweger
asserted "undermine his trial testimony" and requested a jury

30

trial.  In a letter responding to the reply of the SEC dated

June 21, 2010, Rittweger denied knowledge of Blech's fraud which

Rittweger maintained was established only by Blech's testimony.

Rittweger also challenged the propriety of his criminal

conviction based on Blech's testimony.

### III.  Rittweger's Motion for Declaratory Judgment is Denied

#### a.  Declaratory Judgment Is Inappropriate

Rittweger's Motion for Declaratory Judgment is

procedurally improper.  A declaratory judgment is meant "to

clarify and settle disputed legal relationships and to relieve

uncertainty, insecurity, and controversy."  Broadview Chemical

Corp. v. Loctite Corp., 474 F.2d 1391, 1393 (2d Cir. 1971)

(citing E. Borchard, Declaratory Judgments 299 (2d Ed. 1941)).

A motion for declaratory judgment is inappropriate where, as

here, a party has "already invoked its right to a coercive

remedy."  Piven v. Wolf Haldenstein Adler Freeman & Herz LLP,

Slip Op., 2010 WL 1257326 at *11 (S.D.N.Y. March 12, 2010).

Furthermore, declaratory judgment is inappropriate where the

moving party seeks to adjudicate past conduct.  See Nat'l Union

Fire Ins. Co. of Pittsburgh, PA v. International Wire Group,

31

Inc., 2003 WL 21277114 at *5 (S.D.N.Y. June 2, 2003) ("There is no basis for declaratory relief where only past acts are involved.") (citing Gianni Sport Ltd. v. Metallica, 2000 WL 1773511 at *4 (S.D.N.Y. Dec. 4, 2000)).

### b. The Civil Action Is Not Barred By The Criminal Prosecution

"There is no general federal constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions." SEC v. First Fin. Group, Inc., 659 F.2d 660, 666 (5th Cir. 1981); SEC v. Musella, 1983 U.S. Dist. LEXIS 17999 at *2 (S.D.N.Y. April 4, 1983) ("It has long been recognized that the federal government may pursue civil and criminal actions, arising out of the same operative facts, either 'simultaneously or successively.'") (quoting Standard Sanitary Manufacturing Co. v. United States, 226 U.S. 20, 52 (1912); United States v. Kordel, 397 U.S. 1, 11 (1970)). "Parallel civil and criminal proceedings instituted by different federal agencies are not uncommon occurrences because of the overlapping nature of federal civil and penal laws." First Fin. Group, 659 F.2d at

32

666-67; see also SEC v. Palmisano, 135 F.3d 860, 865 (2d Cir. 1998) ("'Congress may impose both a criminal and a civil sanction in respect to the same act or omission'") (quoting United States v. Ursery, 518 U.S. 267, 292 (1996)). "The simultaneous prosecution of civil and criminal actions is generally unobjectionable because the federal government is entitled" to protect the separate interest of different federal agencies at the same time. First Fin. Group, 659 F.2d at 667.

Rittweger's assertion that the Commission's action is barred because of his criminal conviction is without merit.

### c. The Remedies Sought By The Commission Do Not Violate The Double Jeopardy Clause Of The Fifth Amendment

Rittweger has also asserted that the remedies sought by the Commission violate the Double Jeopardy Clause of the Fifth Amendment. However, "[t]he [Double Jeopardy] Clause protects only against the imposition of multiple criminal punishments for the same offense." Hudson v. United States, 522 U.S. 93, 99 (1997)(emphasis in original); see also Palmisano, 135 F.3d at 864. Thus, for the SEC's suit to violate Rittweger's Fifth Amendment rights, the punishment the SEC seeks must be criminal.

33

"Whether a particular punishment is criminal or civil
is, at least initially, a matter of statutory construction."
Id.  The Supreme Court has created guidelines to assist courts
in determining if a purported civil penalty functions as a
criminal penalty.  Hudson, 522 U.S. at 99-100.  In doing so, the
Court noted that "all civil penalties have some deterrent
effect" and if a civil sanction was required to be "'solely'
remedial (i.e., entirely nondeterrent) . . . then no civil
penalties are beyond the scope of the [Double Jeopardy] Clause."
Id. at 102.

A line of cases have applied these guidelines and
found that disgorgement, Commission penalties, and injunctions
are civil penalties, and thus do not violate the Double Jeopardy
Clause.  Palmisano, 135 F.3d at 865-66 ("Congress's intent
clearly favors classifying disgorgement and the fines at issue
here as civil.");  United States v. Van Waeyenberghe, 481 F.3d
951, 958-59 (7th Cir. 2007) ("[Defendant] offers little to no
analysis under Hudson as to why the injunction, disgorgement,
and restitution required of him are anything other than
equitable remedies that present no bar to subsequent criminal
prosecution.");  United States v. Tommassello, 2006 U.S. App.

34

LEXIS 10405 at *2 (3rd Cir. 2006)(unpublished decision) ("The
permanent injunction against Tommassello in the SEC action is
not a criminal punishment and did not trigger the protections of
the Double Jeopardy Clause.").

"[O]nly the clearest proof will suffice to override
legislative intent and transform what has been denominated a
civil remedy into a criminal penalty." Hudson, 522 U.S. at 100
(1997)(citation omitted).  Rittweger has not established such
proof.

The authorities that establish the Commission remedies
are not criminal penalties require dismissal of Rittweger's
motion.  United States v. Perry, 152 F.3d 900, 904 (8th Cir.
1998) ("We join [the Second Circuit] and the several other
circuits that have held that the SEC disgorgement remedies are
not criminal punishments.").

### d.  The Remedies Sought By The SEC Are Appropriate

"Once the district court has found federal securities
law violations, it has broad equitable power to fashion
appropriate remedies." SEC v. First Jersey Securities, Inc.,

101 F.3d 1450, 1474 (2d Cir. 1996).  The Commission has sought

the following remedies against Rittweger:  (i) a permanent

injunction against future violations of the federal securities

laws; (ii) disgorgement and prejudgment interest; (iii) and a

civil monetary penalty.


     Section 20(b) of the Securities Act and Section

21(d)(1) of the Securities Exchange Act grant to the Commission

the authority to seek injunctive relief when it appears, upon

proper showing, "that any person is engaged or about to engage

in any acts or practices which constitute or will constitute a

violation of the provisions [of the Acts]."  15 U.S.C. § 77t(b);

15 U.S.C. §78u(d)(1)(containing substantially similar language).

An enforcement action requesting a permanent injunction must

only show a "reasonable likelihood of future violations."  CFTC

v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979) (citing SEC v.

Advance Growth Capital Corp., 470 F.2d 40, 54 (7th Cir. 1972).


     The "district court has broad discretion to enjoin

possible future violations of law where past violations have

been shown."  SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082,

1100 (2d Cir. 1972).  Factors that courts have considered

include:  "the degree of scienter involved, the sincerity of

36

defendant's assurances against future violations, the isolated
or recurrent nature of the infraction, defendant's recognition
of the wrongful nature of his conduct, and the likelihood,
because of defendant's professional occupation, that future
violations might occur." SEC v. Universal Major Indus. Corp.,
546 F.2d 1044, 1048 (2d Cir. 1976); Manor Nursing Ctrs., 458
F.2d at 1100-1101.  "[P]ast illegal conduct is highly suggestive
of the likelihood of future violations." SEC v. Mgmt. Dynamics,
515 F.2d 801, 807 (2d Cir. 1975).

It is well settled that the Commission may seek, and
the courts may order, disgorgement of ill-gotten gains in
Commission injunctive actions. Major Nursing Ctrs., 458 F.2d at
1104; SEC v. Rind, 991 F.2d 1486, 1493 (9th Cir. 1993).
Disgorgement is an appropriate equitable remedy and within the
discretion of the district court to adopt. SEC v. Patel, 61
F.3d 137, 139-140 (2d Cir. 1995).  The purpose of the
disgorgement remedy is not to compensate the victims of a fraud;
it is to deprive the wrongdoer of his ill-gotten gains. SEC v.
Bear, Stearns & Co., Inc., 626 F.Supp.2d 402, 406 (S.D.N.Y.
2009).  The decision of whether to order prejudgment interest,
like the decision to grant disgorgement and in what amount, is

left to broad discretion of this court.  <u>First Jersey Sec.</u>, 101
F.3d at 1476.


        The Commission seeks $18,128,599.40 in disgorgement
from Rittweger.  Rittweger has been ordered to pay this amount
in restitution in the criminal case.  To the extent that
Rittweger has paid or pays the amount owed in restitution, the
amount of his disgorgement obligation may be offset accordingly.
See <u>SEC v. Opulentica</u>, 479 F.Supp.2d 319, 331 (S.D.N.Y. 2007);
<u>Palmisano</u>, 135 F.3d at 864.


        Pursuant to Section 20(d)(2) of the Securities Act and
Section 21(d)(3) of the Securities Exchange Act, the Commission
may seek civil penalties for violations of the federal
securities laws.  15 U.S.C. §77t(d)(2); 15 U.S.C. §78u(d)(3)
The "House Report on the Penalty Act made clear… 'that authority
to seek or impose substantial money penalties, in addition to
the disgorgement of profits, is necessary for the deterrence of
securities law violations.'"  <u>SEC v. Moran</u>, 944 F.Supp. 286, 296
(S.D.N.Y. 1996) (<u>quoting</u> H.R. Rep. No. 101-616, 101st Cong., 2d
Sess., reprinted in 1990 U.S. Code Cong. & Admin. News 1379,
1384-86).  The decision whether to impose civil penalties and
the amount depends on each case's "own particular facts and

38

circumstances" and is ultimately at the discretion of the court.
Moran, 944 F.Supp. at 297.

The courts look to the same factors in imposing civil
penalties as in the issuance of a permanent injunction.  SEC v.
Brethen, 1992 U.S. Dist. LEXIS 20665 at *104 (S.D. Ohio Oct. 15,
1992).  In deciding the amount of the civil penalty, the court
should analyze "(1) the egregiousness of the defendant's
conduct; (2) the degree of the defendant's scienter; (3) whether
the defendant's conduct created substantial losses or the risk
of substantial losses to other persons; (4) whether the
defendant's conduct was isolated or recurrent; and (5) whether
the penalty should be reduced due to the defendant's
demonstrated current and future financial condition."  SEC v.
Credit Bancorp, Ltd., 2002 U.S. Dist. LEXIS 20597 at *9-10
(S.D.N.Y. Oct. 29, 2002).  See also Official Committee of
Unsecured Creditors of WorldComm, Inc., 467 F.3d 73, 81 (2d Cir.
2006); Bear Stearns, 626 F.Supp.2d at 407; SEC v. Rabinovich &
Assocs., LP, 2008 U.S. Dist. LEXIS 93595 at *18 (S.D.N.Y. Nov.
18, 2008).

Rittweger's current and future financial situation
precludes imposing a penalty.  Rittweger has filed for

39

bankruptcy and is currently incarcerated.  Although he is
scheduled for release from prison at age 56, it is unlikely that
he will accomplish funds such that paying a civil penalty would
be practicable.  Furthermore, the Court finds that the penalties
of disgorgement, criminal restitution, incarceration, and
injunction against future violations imposed on Rittweger are
sufficient to deter future illegal conduct.  A further penalty
at this time is inappropriate.  See, e.g., SEC v. Patel, 1994
U.S. Dist. LEXIS 9479 at *9-11, fn. 4 (S.D.N.Y. July 12, 1994),
aff'd in part, rev'd in part on other grounds, 61 F.3d 137 (2d
Cir. 1995) (finding that the defendant had already suffered
sufficiently through felony conviction, incarceration, criminal
fine, disgorgement, and civil settlements to accomplish the goal
of deterrence and declining in its discretion to impose an
additional civil penalty); SEC v. Mellert, 2006 U.S. Dist. LEXIS
14070 at *3-4 (N.D. Cal. Mar. 28, 2006) (imposing no civil
penalty where the court found that the imposition of such a
penalty was not necessary to accomplish goal of deterrence in
light of criminal fine, incarceration, and Defendant's
relatively less egregious criminal conduct).

## IV.  Plaintiff's Motion for Summary Judgment is Granted

40

### a.  The Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall render summary judgment when the moving party demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  Where the only issues remaining concern the legal consequences of undisputed facts, summary judgment is appropriate.  Fitzsimmons v. Greater St. Louis Sports Enters., Inc., 63 F.R.D. 620, 622 (S.D. Ill. 1974).  Summary judgment has been deemed an appropriate resolution for actions brought by the Commission alleging fraudulent conduct in violation of federal securities laws.  SEC v. Dimensional Entm't Corp., 493 F.Supp. 1270, 1274 (S.D.N.Y. 1980) (stating "in an SEC action seeking injunctive relief, the court should not hesitate to grant a request for summary judgment if the defendant fails to demonstrate that there is a genuine issue for trial"); see also SEC v. Research Automation Corp., 585 F.2d 31, 33-35 (2d Cir. 1978).

Once the SEC has established there are no genuine issues of material fact, the burden shifts to Rittweger to produce evidence showing a genuine issue remains, thus requiring

41

resolution at trial.  United States v. An Antique Platter of

Gold, 991 F.Supp. 222, 228 (S.D.N.Y. 1997); Glazer v. Formica

Corp., 964 F.2d 149, 154 (2d Cir. 1992).  To survive a motion

for summary judgment, Rittweger must make an affirmative showing

of specific issues sufficient to establish that a genuine

dispute of material fact remains.  Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).


A genuine dispute requires more than a "metaphysical

doubt."  Matsushita, 475 U.S. at 586.  "If the evidence is

merely colorable, or is not significantly probative, summary

judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 249-50 (1986)(citations omitted).


Upon that showing, the nonmoving party must "go beyond

the pleadings and by . . . affidavits, or by the 'depositions,

answers to interrogatories, and admissions on file,' designate

'specific facts showing that there is a genuine issue for

trial.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)

(quoting Fed. R. Civ. P. 56(e)).  See also Alhovsky v. Ryan, et

al., 658 F.Supp.2d 526, 531 (S.D.N.Y. 2009) (The nonmoving party

must present "specific facts showing that there is a genuine

issue for trial.") (quoting Fed. R. Civ. P. 56(e)).  The party

42

opposing summary judgment "may not rely on conclusory
allegations or unsubstantiated speculation." Scotto v. Almenas,
143 F.3d 105, 114 (2d Cir. 1998).  The Second Circuit has
determined the non-moving party cannot "escape summary judgment
merely by vaguely asserting the existence of some unspecified
disputed material facts, or defeat the motion through mere
speculation or conjecture." Western World Ins. Co. v. Stack
Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)(citations omitted).
Summary judgment should be entered for the moving party "[w]here
the record taken as a whole could not lead a rational trier of
fact to find for the nonmoving party." Matsushita, 475 U.S. at
587.


        Rittweger did not controvert any of the facts set
forth in the SEC's Statement of Undisputed Facts.  His response
consisted of his conclusory and argumentative assertions with
respect to Blech's testimony and failed to give citations to
admissible evidence.  See, e.g., Wright-Jackson v. HIP Health
Plan, 2010 U.S. Dist. LEXIS 14751 at *18 (S.D.N.Y. 2010).
Summary judgment is appropriate here because Rittweger failed to
meet his burden by not providing sufficient evidence to refute
or call into question the facts the Commission previously set
forth.

43

b. **Rittweger Violated The Antifraud Provisions Of Section 17(a) Of The Securities Act, Section 10(b) Of The Securities Exchange Act, and Rule 10b-5 Thereunder**

Rittweger made material misrepresentations directly to prospective and existing customers of Credit Bancorp, Ltd. and Credit Bancrop, Inc. (collectively, "Credit Bancorp") to lure them into a massive Ponzi scheme, in which at least $90 million in investor funds were misappropriated. Rittweger's actions constituted violations of Section 17(a), Section 10(b), and Rule 10b-5. Rittweger's singular claim that these facts "are now in dispute" is unfounded because the lawsuit on which he bases his claim was previously dismissed with prejudice. Summary judgment is proper because Rittweger failed to produce sufficient evidence to show he did not violate Section 17(a), Section 10(b), and Rule 10b-5, or that a genuine issue exists respecting these facts.

Rittweger's fraudulent statements included: (i) Credit Bancorp would keep investors' assets in custodial accounts in which defendant Brandon would serve as trustee and have signatory or withdrawal power over the account, when in fact Brandon was the signatory on only one minor Credit Bancorp

44

account; (ii) investors' assets would not be transferred, disposed of, or otherwise encumbered, when in fact assets were routinely margined, sold, and placed at risk; (iii) Credit Bancorp earned money through "risk-less arbitrage" transactions with European financial institutions, when in fact, no such transactions existed; (iv) Rittweger falsified the amount of money that had been invested with Credit Bancorp; (v) Credit Bancorp had engaged in a large transaction with Mitsui Trust Bank, when in fact no such transaction had taken place; and (vi) investor assets would be held in U.S. custodial banks or brokerage accounts, when in fact they were often held in foreign bank and brokerage accounts.

In its Memorandum, the Commission provided the factual and legal bases to establish that Rittweger's conduct constituted egregious violations of Section 17(a).  The SEC has established that Rittweger used the means and instrumentalities of interstate commerce in connection with fraud, acted in connection with the sale of securities, made material misstatements, had the requisite scienter, and is collaterally estopped from relitigating Credit Bancorp's fraudulent conduct and his own knowledge of and participation therein because of his criminal convictions.

Rittweger provided no evidence to refute or call into question the fact that he made material misrepresentations to several investors that resulted in multiple egregious violations of Section 17(a), Section 10(b), and Rule 10b-5.  Rather than providing the affirmative showing of specific issues the law requires, Rittweger, in his Letter, made a single broad claim in attempting to create a genuine issue of material fact; that the facts "are now in dispute" because his codefendant, Blech, sued the court appointed receiver, Carl H. Loewenson, Jr. in the Netherlands Antilles.

Blech's case was dismissed with prejudice on May 17, 2010 based upon the fact that it was time-barred.  Blech's case was Rittweger's only basis for stating the "facts are in dispute."  Since Blech's case was dismissed with prejudice for being meritless, Rittweger's claim is now groundless.  Beyond this groundless claim, Rittweger made no further attempt to affirmatively show specific issues sufficient to establish that he did not violate Section 17(a), Section 10(b), and Rule 10b-5.

Even if Blech's case had not been dismissed, Rittweger's claim is not an affirmative showing of specific

46

issues sufficient to raise a genuine issue of material fact as
to whether the SEC was wrong in determining Rittweger violated
securities laws.  See Matsushita, 475 U.S. at 585-86.
Rittweger's claim that Blech said the "U.S. [sic] Attorney
coerced and threatened [Blech] into testifying against
[Rittweger]" is nothing more than an unsubstantiated allegation.

Even if Rittweger were correct, and Blech's criminal
trial testimony contained inaccuracies, there is ample
independent evidence in the SEC's Statement of Undisputed Facts
to provide a basis for summary judgment.  The testimony of the
investors, Stephen Joffe, William St. Laurent, and Charles
Stephenson all provide an independent evidentiary foundation for
the SEC's motion.  The bank records for his Credit Bancorp and
Commerce Capital Markets accounts also provide an independent
record for his federal securities law violations.

Rittweger's unsupported contention does not establish
that his criminal conviction for securities fraud was improper.
Accordingly, the claim provides no independent facts that affect
the outcome of this action because it does not establish that
the Commission erred in determining Rittweger violated
securities laws.  See General Elec. Co. v. NY State Dept. of

47

Labor, 936 F.2d 1448, 1452 (2d Cir. 1991) (quoting Anderson, 477
U.S. at 248).


      Rittweger's claims fail to rise to the affirmative
showing of specific facts sufficient to establish that he did
not violate Section 17(a), Section 10(b), and Rule 10b-5 and no
genuine issue of material exists.


### c.  Rittweger Is Collaterally Estopped


      Rittweger makes no attempt to dispute the SEC's claim
that he is collaterally stopped from relitigating the facts
which underlie his criminal conviction.  In a civil case, a
defendant cannot controvert facts that were established in a
previous criminal conviction based on the same facts.  "It is
well established that a prior criminal conviction may work an
estoppel in favor of the Government in a subsequent civil
proceeding" as long as the issues in the civil litigation were
"distinctly put in issue and directly determined in the criminal
prosecution."  Emich Motors Corp. v. Gen. Motors Corp., 340 U.S.
558, 568-69 (1951) (quoting Frank v. Mangum, 237 U.S. 309, 334
(1915) (internal quotations and citations omitted)); see also
United States v. Greater N.Y. Live Poultry Chamber of Commerce,

53 F.2d 518 (S.D.N.Y. 1931), aff'd sub nom. Local 167 v. United
States, 291 U.S. 293 (1934); United States v. Meyerson, 24 F.2d
855, 856 (S.D.N.Y. 1928).


When a criminal court finds against a party in favor
of the United States, the facts upon which that conviction was
based are firmly set as conclusive and may not be denied.
International Bhd. of Teamsters v. United States, 291 U.S. 293,
298-99 (1934); see also United States v. Greenberg, 237 F.Supp.
439, 441-42 (S.D.N.Y. 1965).  In International Bhd. of
Teamsters, the civil complaint alleged facts on which a previous
criminal prosecution and conviction were based.  291 U.S. at
298.  The defendants denied the allegations in their civil
answer, despite the fact they had previously been criminally
convicted on the same facts the civil complaint alleged.  Id. at
298-99.  The U.S. Supreme Court determined that the defendants
could not deny, in their civil answer, facts that were
established in their previous criminal conviction, and that the
defendants' attempt to deny these facts was "false and sham and
the district court rightly so treated them."  Id.  Relying on
International Bhd. of Teamsters and Emich Motors Corp., this
Court held, in Greenberg, that plaintiff United States could
"rely upon the prior [criminal] judgment of conviction of

49

defendant after trial to establish the issues relevant to this
case which were necessarily determined by the conviction."   237
F.Supp. at 442.


          The Complaint, Original Indictment, and Superseding
Indictment all allege Rittweger (i) made misrepresentations and
omissions of material facts in connection with the offer and
sale of securities; (ii) participated in the fraudulent offer
and sale of the Credit Bancorp insured credit facility; (iii)
made material misrepresentations to investors regarding the
placement of securities in custodial accounts, that funds were
used to pay earlier investors, and that funds were used for
unauthorized personal and business expenditures; and (iv)
represented that Credit Bancorp had conducted more than one
billion dollars in transactions since 1991 and that Credit
Bancorp made money through riskless arbitrage conducted by
unnamed foreign financial institutions.  Additionally, the
Complaint, Original Indictment, and Superseding Indictment all
identify three specific transactions in which Rittweger and
others fraudulently obtained securities through false statements
to investors.  Rittweger was convicted on all thirteen counts
contained in the Superseding Indictment, was sentenced to 135

50

months imprisonment followed by three years of supervised
probation, and ordered to pay $18,127,829.42 in restitution.


Courts regularly find that, where the criminal action
supersedes the resolution of the SEC's enforcement action, a
defendant is collaterally estopped from relitigating issues in
the civil forum.  See SEC v. David L. Namer, 183 Fed. Appx. 120,
121 (2d Cir. 2006) ("we conclude that the District Court
properly granted partial summary judgment after determining that
Namer was collaterally estopped from relitigating the liability
issues presented during the course of his criminal trial and
conviction"); SEC v. Glantz, 2009 U.S. Dist. LEXIS 95350 at *11
(S.D.N.Y. 2009) ("Accordingly, so long as Glantz's conviction by
guilty plea establishes the requisite elements of securities
fraud, Glantz is estopped from challenging his liability under
Section 10(b) and Rule 10b-5 of the Exchange Act and Section
17(a) of the Securities Act"); Opulentica, 479 F.Supp.2d at 326
("Sheikh was convicted by guilty plea on securities fraud
charges related to the same activities at issue here.  Thus, all
questions of fact material to and underlying Sheikh's criminal
conviction, as established during the plea allocution, bind
Sheikh in this subsequent civil action"); SEC v. Freeman, 290
F.Supp.2d 401, 405 (S.D.N.Y. 2003) ("It is settled that a party

51

in a civil case may be precluded from relitigating issues
adjudicated in a prior criminal proceeding and that the
Government may rely on the collateral estoppel effect of the
conviction in support of establishing the defendant's liability
in the subsequent civil action").  It is of no moment whether
the criminal defendant's conviction arises out of a plea
allocution or a trial.  SEC v. Roor, 2004 U.S. Dist. LEXIS 17416
at *22-23 (S.D.N.Y. 2004) (granting summary judgment in a SEC
enforcement action based on collateral estoppel following
defendant's guilty plea); Opulentica, 479 F.Supp.2d at 326.
"Whether established at plea allocution or at trial, all facts
material to the conviction bind the criminal defendant in later
civil litigation."  SEC v. McCaskey, 2001 U.S. Dist. LEXIS 13571
at *9 (S.D.N.Y. 2001).


          Rittweger cannot deny these facts in the instant civil
action.  See Emich Motors Corp., 340 U.S. at 568-69;
International Bhd. of Teamsters, 291 U.S. at 298-99; Greenberg,
237 F.Supp. at 441-42; Greater N.Y. Live Poultry Chamber of
Commerce, 53 F.2d at 518; Meyerson, 24 F.2d at 856.  Rittweger
has provided no specific evidentiary basis to controvert the
Commission's facts.  Accordingly, the facts are established,

52

there is no genuine issue of material fact, and Rittweger is collaterally estopped from relitigating these issues.

## Conclusion

Based on the facts and conclusions set forth above, Rittweger's Motion for Declaratory Judgment is denied in whole and the SEC's Motion for Summary Judgment is granted, but denied as to the imposition of a further penalty.

Submit judgment on notice.

It is so ordered.

New York, NY
September 10, 2010

ROBERT W. SWEET
U.S.D.J.